SANDRA FRANKLIN, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Carson Pirie Scott, Appellee).

First District (Industrial Commission Division)   No. 1—02—2236WC

Opinion filed June 4, 2003.—Rehearing denied July 3, 2003.

McCULLOUGH, P.J., dissenting.
HOLDRIDGE, J., dissenting.

Richard J. Barr, Jr., of Lannon, Lannon & Barr, Ltd., of Chicago, for appellant.

Thomas J. Fitzgibbons, of Inman & Fitzgibbons, Ltd., of Chicago, for appellee.

JUSTICE CALLUM delivered the opinion of the court:

Claimant, Sandra Franklin, filed an application for adjustment of claim under the Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 2000)) for injuries to her left arm. The arbitrator found that claimant's injuries did not arise out of and in the course of her employment with Carson Pirie Scott (employer). The arbitrator concluded that claimant's injuries arose out of a fight between herself and a coworker, that the altercation was of a personal nature, and that claimant was the aggressor. The Commission denied compensation, finding that the altercation was not of a personal nature, but that both claimant and her coworker were aggressors. The circuit court

confirmed the Commission's decision. Claimant appeals. We reverse and remand.

## I. BACKGROUND

Claimant began working for employer at its River Oaks store in Calumet City as a cosmetic artist and counter manager for the Elizabeth Arden cosmetic line in early 2000. Claimant's coworker, Geniver Mohan, sold a different cosmetic line from a bay directly across from claimant's bay.

Employer's sales policy provided that, if a customer purchased cosmetics at an employee's sales counter, the employee was permitted to go to a different sales counter to sell another cosmetic line's products. However, if a customer did not purchase cosmetics at the employee's counter, then the employee could not follow the customer to a different counter to sell a different product line. The foregoing rules applied to all cosmetics sales staff, and claimant testified that she and Mohan were aware of the rules.

Claimant further testified that she knew Mohan "vaguely" before claimant started working for employer. She also testified that she did not know Mohan before she started working for employer, but would occasionally purchase cosmetics from her. Claimant further testified that both her and Mohan's salaries were based in part on commissions from cosmetics sales.

Claimant stated that she began experiencing problems with Mohan in August 2000, when Mohan sold products from claimant's counter area. Claimant told her manager, Annette Simmons, about the incidents and filed a complaint. Simmons called a meeting. Claimant complained that Mohan did not have sales at her counter to permit her to sell at claimant's counter. Claimant testified that Mohan stated that she had heard complaints about claimant stealing sales.

About four or five days later, claimant testified that she and Mohan were walking past each other and that Mohan hit claimant with her shoulder and dared claimant to push her or to put her hands on her. Claimant testified that she extended her hands to push Mohan away. Claimant further testified that Mohan did not ask her to refrain from putting her hands on her. Claimant felt threatened by the encounter because Mohan was so close to her that claimant could smell Mohan's breath. On August 19, 2000, claimant reported the incident to store security and to the store manager, Terry Turner. However, in her written report, claimant wrote that Mohan asked claimant to refrain from touching her.

Claimant testified that she had about four or five similar physical encounters with Mohan. Claimant submitted her second report on

August 23, 2000. Claimant testified that she also submitted reports in September and November of 2000 and that she turned in her November report to security agent Mr. Haskell.

On February 18, 2001, both claimant and Mohan were working for employer. At about 4 p.m., three or four customers were standing by claimant's bay. Claimant testified that she had acknowledged the customers and told them that she would take care of them all as soon as possible. She stated that all of the customers told her that they would wait their turn. Claimant testified that Mohan approached one of claimant's customers, asking if she could assist the customer. Claimant told Mohan that the customers had agreed to wait for her. Mohan then became angry and told the customer that she did not have to wait for claimant. The customer stated that she would wait for claimant. Claimant stated that Mohan became verbally abusive and that the customer asked for a piece of paper and to speak to the manager.

Claimant testified that the customer completed a complaint card and spoke to store manager Barbara Gerrard. Mohan threatened to get even with claimant and said that she was sick of claimant telling her what to do and where she could go on the sales floor. The parties were standing near claimant's bay during this conversation. Claimant stated that Mohan was pointing her finger at claimant and stated that she was going to get claimant and even the score because she was tired of claimant getting her in trouble. Claimant testified that she felt threatened because Mohan was reaching over and pointing at her. Claimant testified that Gerrard told Mohan to return to her bay and thanked claimant for not arguing.

Claimant further testified that, after Gerrard left, Mohan exited her bay and walked over to claimant's bay and started shouting at claimant. Mohan stated that she was going to finish the thing between them and show claimant who she was and what she could do. Mohan was shouting at claimant and pacing back and forth in front of claimant's bay. Claimant stated that she was scared, started crying, and then left the floor.

Claimant returned 20 minutes later with aspirin. She picked up a cup in her bay to obtain water. Mohan walked alone to claimant's bay and began shouting at claimant, stating that claimant was not "going to get away." Claimant walked to another bay and telephoned security. She was told to return to her bay. When she returned, claimant testified that Mohan was at claimant's bay pointing at claimant and shouting at her. Mohan stated that she was "going to finish what she should have finished a long time ago." Claimant stated that Mohan was "not going to let this be over with, so you need do what you do best." Claimant further testified that Mohan's arms were outstretched. Mo-

han then walked around a promotional table near the entrance to claimant's bay. Claimant stepped back and Mohan then grabbed claimant's left arm and hair and pulled claimant toward her. Claimant picked up her cup and struck Mohan in the head. A coworker pulled the two employees apart.

Upon review of a security videotape, claimant testified that it showed Mohan walking to the entrance of claimant's bay with her arms crossed.

Claimant testified that she felt a lot of pain in her arm. She was transported to a hospital. Claimant's doctor subsequently prescribed taking bone and artery from claimant's leg and transplanting it to her left arm, which he had previously treated for cancer. Claimant testified that she had not undergone the surgery because she had no health insurance.

Ellen Edwards, employer's loss prevention manager, testified that claimant never filed any incident or investigative reports with loss prevention in November 2000. However, investigative summaries can be turned in to supervisors. She further stated that an agent named Haskell did not work at the River Oaks store in November 2000.

Courtney Harris, a Lancome beauty advisor for employer, testified as follows. On February 18, 2001, at about 4:40 p.m., Mohan walked from the opening of her counter to the front of claimant's counter, about three to four feet away. At this time, Harris was about six to seven feet away. Harris testified that claimant said to Mohan, in a normal tone: "You don't intimidate me. I'm not afraid of you. If you're going to do something come do it." Harris did not believe that Mohan was walking over to strike claimant. Mohan said that claimant could not tell Mohan what to do and that Mohan could go wherever she wanted to go. Harris did not observe who made the first physical contact.

Barbara Gerrard, acting day manager for employer on February 18, 2001, at employer's River Oaks store, testified that she gave the customer comment card to the customer, and the customer did not return the card to Gerrard. In her written statement about the incident, however, Gerrard made no reference to giving the comment card to the customer.

Claimant testified on rebuttal that she observed the customer completing the comment card and claimant handed it to Gerrard. When Mohan approached her, claimant testified that she did not say to Mohan that she was not afraid of her. She also denied saying to Mohan to go ahead and do it.

When called to testify, Mohan invoked her fifth amendment (U.S. Const., amend. V) privilege against self-incrimination.

In a decision dated July 13, 2001, the arbitrator denied claimant temporary total disability benefits and found that claimant's injury did not arise out of or in the course of her employment. Based on his review of the security videotape, the arbitrator found that claimant was the aggressor and that she attacked Mohan with a cup as soon as Mohan was near the bay opening. Mohan did not approach claimant in a threatening manner, but had her arms folded when claimant lunged at her. The arbitrator further found that Mohan did not pull claimant's hair or arm before the attack. Claimant was not credible. Claimant's injuries, thus, did not arise out of or in the course of her employment with employer. The dispute arose out of the parties' drive for sales commissions, and there was no causal relationship between claimant's injuries and a work incident. The arbitrator thus denied claimant's request for medical costs, temporary total disability benefits, and permanent partial disability benefits.

Claimant appealed, and the Commission denied claimant's request for compensation, concluding that claimant failed to prove accidental injuries arising out of and in the course of her employment with employer. The Commission found claimant's testimony largely uncorroborated, inconsistent, and implausible. Specifically, the Commission noted that, although claimant contended that she filed three incident reports between August and November 2000 regarding Mohan's bumping her and claimant feeling threatened, the documentary evidence revealed that only one incident allegedly involved bumping and no report contains any indication that claimant felt threatened. The Commission further noted that claimant's testimony that her third incident report was filed in November and turned in to security chief Haskell was rebutted by Edwards's testimony that no report was filed by claimant in November and that Haskell was not working at employer's River Oaks store at that time.

The Commission found that claimant's version of the encounter on February 18, 2001, lacked credibility. Claimant's assertion that all of the customers agreed to wait their turn was unconvincing, given that one customer desired to complain to a manager and given that Mohan, not claimant, called for supervision. Claimant was not an innocent bystander in the dispute. Gerrard testified that her conversation with the customer revealed that the complaints were related to both claimant's and Mohan's behavior.

The Commission noted that Harris's testimony contradicted claimant's. Harris testified that when claimant returned to her counter after she had left crying, she verbally confronted Mohan, told her that she was not intimidated by her, and invited Mohan to do something if she wanted to do so. Harris believed that Mohan was not going to

strike claimant when Mohan approached the opening of claimant's counter.

The Commission noted that the security video showed Mohan approaching claimant's work area with her arms folded, contrary to claimant's testimony. It also noted that, although claimant was somewhat obscured in the video, it appears that she struck the first blow, as the video showed claimant's hand holding the cup and rising toward Mohan's head prior to any overt action by Mohan.

The Commission concluded that claimant's testimony was unworthy of belief and found that the dispute was initiated by claimant's refusal to permit Mohan to make legitimate sales in accordance with employer's policies. Both claimant and Mohan were equal participants in the altercation and thus both were aggressors. Accordingly, the Commission denied claimant compensation. Because the altercation was the culmination of a dispute over sales commissions, the Commission concluded that it constituted a continuation of a work dispute.

One commissioner dissented, arguing that the majority's conclusion that both parties were aggressors was not based on established law. The dissenting commissioner concluded that Mohan was the aggressor in the altercation and thus claimant was entitled to compensation.

The circuit court confirmed the Commission's decision, and claimant appeals. She argues first that the Commission erred as a matter of law in concluding that both parties were the aggressors. Claimant argues next that the Commission's conclusion that claimant was an aggressor was against the manifest weight of the evidence.

## II. ANALYSIS

Claimant argues that the Commission's determination that both claimant and Mohan were aggressors is erroneous as a matter of law. She notes that the Commission cited no authority for the proposition that both participants in a workplace altercation can be deemed aggressors. At a minimum, claimant requests that we remand the cause so that the Commission can determine the proper aggressor. We agree.

■ The question of whether there can be two aggressors in an altercation constitutes a question of law. We review *de novo* questions of law. *D. Mayer Landscaping, Inc. v. Industrial Comm'n*, 328 Ill. App. 3d 853, 857 (2002).

Generally, injuries arising from an assault by a coworker at the workplace during work hours are compensable if the assault arose in the course of a dispute involving the conduct of the work. *Village of Winnetka v. Industrial Comm'n*, 250 Ill. App. 3d 240, 243 (1993).

However, where the party seeking compensation was the aggressor, the party's acts are not within the scope of employment and are not compensable. *Ford Motor Co. v. Industrial Comm'n*, 78 Ill. 2d 260, 263 (1980).

■ No Illinois case has addressed the issue of whether more than one employee may be deemed an aggressor. However, in discussing the so-called "aggressor defense" or "initial aggressor defense," commentators define it as a defense that denies compensation to the party who initiates the altercation, typically through physical means. See 1 A. Larson & L. Larson, Larson's Workers' Compensation Law § 8.01(5)(c) (2002); Modern Workers Compensation § 114:11 (West 2003).

States that have codified the aggressor defense limit its application to the employee who makes the first physical contact. See, *e.g.*, Cal. Lab. Code § 3600(a)(7) (West 2000) (injury noncompensable if it arises out of an altercation in which the injured employee was the initial physical aggressor); La. Rev. Stat. Ann. § 23:1081(1)(c) (West 2000) (compensation denied for injuries caused to the initial physical aggressor in an unprovoked physical altercation, unless excessive force is used in retaliation against the initial aggressor).

The defense is currently recognized by a minority of jurisdictions (see 1 A. Larson & L. Larson, Larson's Workers' Compensation Law § 8.01(5)(a), at 8—20 (2002)), including Illinois (*Ford Motor Co.*, 78 Ill. 2d at 263). The defense's critics argue that one of the difficulties in applying the defense is determining who made the first physical contact. See, *e.g.*, 1 A. Larson & L. Larson, Larson's Workers' Compensation Law § 8.01(5)(c), at 8—27 (2002) ("One of the practical difficulties besetting the application of the aggressor defense is the homely fact that, long after the quarrel is over, it is often almost impossible to determine who really started it"); *Geeslin v. Workmen's Compensation Commissioner*, 170 W. Va. 347, 349, 294 S.E.2d 150, 152-53 (1982) ("In application, the rule devolves into hairsplitting distinctions between the fault of parties whose actions are not logically distinguishable as to aggressor/victim status"); *Petro v. Martin Baking Co.*, 239 Minn. 307, 312, 58 N.W.2d 731, 735 (1953) ("[I]t is artificial to say that an injury to the one who struck the first blow did not arise out of the employment but an injury to the recipient of that blow did arise out of the employment"). We note that other criticisms of the aggressor defense are that the rule relies too heavily on the fault-based concept that has been borrowed from tort law and thus has no place in workers' compensation law (see, *e.g.*, *Geeslin*, 170 W. Va. at 349, 294 S.E.2d at 152; G. Singer, *Workers' Compensation: The Assault on the Shield of Immunity—Coming to Blows with the*

*Exclusive-Remedy Provisions of the North Dakota Workers' Compensation Act,* 70 N.D. L. Rev. 905, 924 (1994) (defense "creates a fault-based defense in a no-fault system")) and that the defense does not appear in most compensation statutes (1 A. Larson & L. Larson, Larson's Workers' Compensation Law § 8.01(5)(c), at 8—26 (2002)). Considering these criticisms and the passage of 23 years since the *Ford Motor Co.* decision, we note that it is likely time for Illinois to revisit the continuing vitality of the aggressor defense.

■ According to the foregoing descriptions of the aggressor defense, only one participant in a workplace altercation can be deemed an aggressor. Thus, we conclude that the Commission erred in determining that both claimant and Mohan were aggressors. We respectfully disagree with the dissent's contention that, so long as the Commission's finding that claimant was an aggressor is supported by the record, it is "irrelevant" that the Commission found both employees to be aggressors. 341 Ill. App. 3d at 137 (McCullough, J., dissenting). The Commission clearly concluded that "[Claimant] and Mohan were in fact equal participants in the altercation[,] marking them both as the aggressor." The dissent's analysis essentially ignores part of the Commission's finding. We believe that this approach is incorrect in that it disregards the Commission's misapplication of the aggressor defense. Accordingly, we reverse and remand the cause for the Commission to determine which party was the aggressor. Because we remand the cause, we need not address claimant's second argument.

Reversed and remanded.

HOFFMAN and GOLDENHERSH, JJ., concur.

PRESIDING JUSTICE McCULLOUGH, dissenting:
I respectfully disagree.

The fact that one party made the first physical contact is not decisive in determining who was the aggressor and such a determination depends upon the totality of the circumstances. *Ford Motor Co.,* 78 Ill. 2d at 263, 399 N.E.2d at 1282; *Chicago Park District v. Industrial Comm'n,* 263 Ill. App. 3d 835, 842, 635 N.E.2d 770, 775 (1994).

Here, the dispute between claimant and her coworker was work-related, and therefore, the injury from the altercation arose out of claimant's employment. *Schultheis v. Industrial Comm'n,* 96 Ill. 2d 340, 345-46, 449 N.E.2d 1341, 1344 (1983); *Graphic Group & KLW, Inc. v. Industrial Comm'n,* 167 Ill. App. 3d 1041, 1043, 522 N.E.2d 128, 130 (1988). However, as stated in *Ford Motor Co.,* the injuries of

an aggressor are deemed not within the scope of employment because they are traceable to her own "voluntary acts." *Ford Motor Co.*, 78 Ill. 2d at 263, 399 N.E.2d at 1282. As a result, any person who voluntarily participates in physical combat in the workplace may be found to be an aggressor and denied benefits. A person who is attacked or threatened may have no choice but to defend herself and could arguably be found to not be an aggressor even though making the first physical contact in a defensive manner. See *Chicago Park District*, 263 Ill. App. 3d at 841-42, 635 N.E.2d at 775. On the other hand, a third employee who has not been involved in the argument, sees a fight, joins the fray, and is then injured, has voluntarily participated in the physical combat and could be denied benefits even though she did not initiate or instigate the combat.

Where both of the employees involved in the altercation are equally responsible for fomenting the dispute by mutually irritating each other, equally responsible for initiating the combat, and equally participated in the combat, the Commission could reasonably find that neither is entitled to benefits because the voluntary action of fighting took both employees out of the scope of their employment. The Commission's determination that claimant and her coworker were both aggressors and equally at fault was not erroneous as a matter of law. In addition, it is irrelevant that the Commission found both employees were aggressors as long as the Commission's finding that claimant was an aggressor is supported by the evidence.

A reviewing court will not disregard permissible inferences drawn by the Commission merely because different reasonable inferences may be drawn from the same set of facts. *Martin v. Industrial Comm'n*, 227 Ill. App. 3d 217, 219, 591 N.E.2d 108, 109 (1992). It is the province of the Commission to resolve any conflicts in the testimony and to choose between conflicting inferences. *Dexheimer v. Industrial Comm'n*, 202 Ill. App. 3d 437, 442, 559 N.E.2d 1034, 1037 (1990).

The Commission found that claimant's testimony concerning her relationship with Mohan was uncorroborated and contained numerous inconsistencies, implausible explanations, and statements directly contradicted by the evidence. The Commission found that claimant "overtly engaged in prevarication" and was not worthy of belief. In particular, the Commission found claimant's testimony about the initiation of the incident that precipitated the combat was lacking in credibility.

Gerrard testified that it was Mohan, not claimant, who called her to settle a dispute and that her conversations with a customer revealed complaints about the behavior of both employees. Harris testified that, after the initial encounter on February 18, 2001, claimant left the area

in tears, but later returned and confronted Mohan in front of Mohan's counter and invited Mohan to "do something." The Commission also viewed the security video in very slow motion. As a result of that viewing, the Commission found that Mohan approached claimant's counter with her arms folded and was pointing her finger as she came toward the counter opening and that claimant struck the first blow. The Commission also found that claimant initiated the dispute that led to the altercation by refusing to allow Mohan to make legitimate sales in accordance with company policy, she and Mohan both continued a course of aggressive conduct, and their failure to withdraw escalated the disagreement into physical violence. The Commission's determination that claimant was an aggressor has support in the evidence and was not against the manifest weight of the evidence.

Finally, although the majority "notes that it is likely time for Illinois to revisit the continued vitality of the aggressor defense" (341 Ill. App. 3d at 136) we have by this decision made the revisit.

The order of the circuit court of Cook County confirming the Commission's decision should be affirmed.

JUSTICE HOLDRIDGE, dissenting:

Contrary to the majority's assertion, I do not believe the Commission misapplied the so-called aggressor defense. Admittedly, prior cases employ the definite article ("the") when identifying aggressors who are excluded from compensation. But I cannot see why this approach deserves a future monopoly. The mere fact that prior cases facilitated findings of a sole responsible party does not eliminate the possibility of a scenario involving combatants whose aggression truly qualifies as mutual.

The policy behind the aggressor defense is clear: to exclude benefits for injuries that are "traceable to [the employee's] own voluntary acts." *Ford Motor Co. v. Industrial Comm'n*, 78 Ill. 2d 260, 263 (1980). The relevant inquiry is whether the claimant was "responsible for the aggression." *Ford Motor Co.*, 78 Ill. 2d at 262. Accordingly, compensation should be denied to both perpetrators of mutual aggression. Awarding benefits to either employee in such a scenario would contravene the policy accounting for the very existence of the defense. The majority overlooks this fact by devoting its attention to the difference between definite and indefinite articles ("the" versus "an"). In many cases such a difference matters; however, it is a red herring where multiple employees remove themselves from the scope of their employment by voluntarily engaging in aggression.

The majority's analysis is, I believe, too wedded to semantics suggesting we lack the authority to structure the defense in a way that serves its purpose. I respectfully disagree.